# T. LYLE DICKEY *et al.*

*v.*

# CHARLES H. REED *et al.*

1. INJUNCTIONS—*power to award them.* To the complete authority of a court to award an injunction, it is necessary that there shall be a complainant, who must file a bill, alleging facts, showing that he has an interest in the matter in litigation, or at least a right to complain and have relief for others. There must be a matter about which rights are claimed, and that matter must be within the power of the court, when properly before it, to act upon or control it, by its sentence; and if any or either of these essential requirements are wanting, the court can not decree that a restraining order shall issue.

2. A court of chancery has no power to restrain, by injunction, a board of canvassers from canvassing the returns of an election, where the law under which the election was held, neither in terms nor by implication confers such power, and where there are no facts before the court which require it to take judicial cognizance, and hear, adjudicate and decree.

3. Whilst the writ of injunction is one of the most important in the law, and is, in fact, indispensable to the complete administration of justice, it is liable to great abuse, and it would not be wise, nor would it promote justice, to extend its use to cases of doubtful right, or to accomplish ends where there are other adequate remedies.

4. SAME—*when writ void.* A writ of injunction, issued in a matter where the court could not, under any circumstances, have power to hear, determine and decree in reference to such matter, is *coram non judice,* and void.

5. SAME—*when issued by a court having no power, need not be obeyed.* Where a writ of injunction is issued by a court which has power over the subject matter, and authority to take jurisdiction, it must be obeyed; but where the power of the court is wholly wanting, the writ is void, and can legally operate on no one, nor can any one be punished for contempt for disobeying it.

6. POLITICAL POWER OF THE STATE—*not subject to the control of the courts.* It was not designed, when the fundamental law of the State was framed, that either department of government should interfere with or control the other, and it is for the political power of the State, within the limits of the constitution, to provide the manner in which elections shall be held, and how they shall be contested, and the courts can not interfere.

7. The political power of the State may organize municipal bodies, and put them into operation by force of enactment, or by election by the people to be thus governed, and may provide the mode of reviewing the returns of all elections, to ascertain whether they are in accordance with the expressed will of the people, and until the courts are empowered to act, by the constitution or by legislative enactment, they must refrain from interference.

8. CONTESTED ELECTIONS—*power of a court of chancery.* When the law provides a mode for contesting an election, that mode must be followed.

9. Courts of equity have no inherent power to try contested elections, and they have never exercised such power, except in cases where it has been conferred by express enactment or necessary implication therefrom.

10. Where an election was held in a city on the question of whether the municipality should become incorporated under the general incorporation act for cities and villages, and a writ of injunction was issued out of the circuit court, enjoining and restraining the board of canvassers from canvassing the returns and declaring the result, it was *held,* that the circuit court had no power to issue the writ, and therefore it was utterly void, and the canvassers were not bound to obey it, and could not be punished for contempt for refusing to obey it.

11. COUNTY SEAT CONTESTED ELECTIONS—*jurisdiction in, conferred by implication on courts of equity.* Where courts of equity in this State have taken jurisdiction of contested county seat election cases, it has been upon the express ground that the constitution had provided that county seats should not be removed, except upon a vote of a majority in favor of removal, and that the legislature, in providing for such elections, failed to provide any means of contesting them; and to protect the rights of the

majority intended to be secured to them, it was *held*, that the fundamental law, by implication, conferred the power on courts of chancery to hear and determine such cases. .

12. But these cases are an exception to all other cases, and if they are recognized as a class of cases, they are a class in which nothing but county seat questions are embraced, and no other character of election cases is embraced therein, and the rule is not to be considered as extending the power to other or different cases.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

Mr. T. LYLE DICKEY, Mr. M. F. TULEY, Mr. WM. C. GOUDY, Mr. EMERY A. STORRS, Mr. JAMES P. ROOT, and Mr. FRANCIS ADAMS, for the appellants.

Messrs. ROSENTHAL & PENCE, and Messrs. LAWRENCE, CAMPBELL & LAWRENCE, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

On the 23d day of April, 1875, an election was held in the city of Chicago, to determine whether that municipality would change its charter, and the people would become incorporated under the general incorporation act for cities and villages, which went into force on the first day of July, 1872. On the 26th of that month, the prosecuting attorney and five others, tax-payers of the city, filed a bill in the circuit court of Cook county against forty aldermen, composing the common council of the city, and the city clerk. It alleges the omission, by the mayor and common council, to submit, in express terms or otherwise, to a vote of the people, the question of minority representation, and charges that, on account of such omission, the election held on the 23d of the month was void; also, that a large number of illegal and fraudulent votes were cast in favor of organization under the law; that a large number of ballots not actually cast by voters were deposited in the ballot boxes by the judges, or by their connivance; that in some of the wards there were no poll lists and no clerks, and

that if the illegal votes were rejected, the result would be against organization under the act; that the judges had returned, or were about to return, their canvass of the votes, including such illegal and fraudulent votes so cast and received, and those cast at the polling places where no poll lists were kept; and that complainants had good reason to believe, and did believe, that the common council would proceed to declare the act of 1872 adopted.

Affidavits were filed in support of the bill, and in compliance with the prayer thereof a temporary injunction was ordered, restraining that body from canvassing the returns made to them by the judges and clerks of the election. The injunction was to remain in force ten days, with leave to defendants to move to dissolve, and like leave to the complainants to move to continue the same.

The writ was issued and served on the 26th of April. The common council, on the same day, were in session, and after the writ was served they appointed a committee to procure legal advice and assistance to defend the suit. They employed Wm. C. Goudy, M. F. Tuley, E. A. Storrs, and J. P. Root, to assist the regular law officers in such litigation as might grow out of the election.

After being thus employed, the mayor of the city put to them, and to the corporation counsel and his assistant, the question whether the members of the common council would be liable to punishment for contempt of court if they should, notwithstanding the injunction, proceed to canvass the returns, and declare and certify the same. They, after deliberation, answered, that the circuit court had no jurisdiction in the case, and the writ was void, and that the defendants could not be legally punished for contempt, in case they should disobey the writ.

These opinions were in writing, signed by counsel and delivered to the mayor, and at a meeting of the common council, on the 3d of May, 1875, were read to that body whilst in

session, and they canvassed the returns, declared the result, and caused it to be entered on the records of the city.

On the 4th of May, the original bill was amended and a supplemental bill was filed, making the city a party, and setting out what had subsequently transpired after issuing the writ, and praying that the city be restrained from exercising the powers conferred by the act of 1872, thus declared to have been adopted. A motion to strike the supplemental bill from the files was overruled.

On the next day defendants answered the original and supplemental bills, and complainants moved to continue the injunction, but the motion was denied. The injunction expired by the lapse of time. On the 12th of that month complainants dismissed their supplemental bill.

On the 14th, complainants, on affidavits filed, moved for a rule on the members of the common council who canvassed the returns and the attorneys who signed the opinions, to show cause "why they should not be punished and committed" for a contempt of court—the members for violating and the attorneys for advising the violation of the injunction.

A rule was, accordingly, entered, requiring them to show cause by the 21st of May, at 10 o'clock, and requiring them to answer interrogatories. They were subsequently exhibited, and answers thereto were filed by all of the defendants. The members of the common council admitted the canvassing of the returns, and the attorneys admitted the giving of the opinions referred to herein. The court found the defendants guilty of a contempt, and fined each of a number of aldermen $100, and each attorney $300, and they all appeal to this court.

It is first urged, that there is error in the form in which the judgments are entered. This may be true, but we have chosen to consider and determine the case on its merits, passing over technical objections.

The General Assembly have not only failed to define the offense of resisting the authority of the State, as exercised by the courts, and declare the penalty or punishment to be

inflicted, but in the last revision of our statutes omitted the prior provision on the subject. They have thus repealed the law authorizing courts to punish contempts offered in the presence of the same, and for disobedience to their orders and process. Whether it was the design of that body to strip the courts of that power, or to leave them to exercise the undefined power as it existed at the common law, or whether, the courts being created by the constitution, and the power to punish for contempts being inherent in courts of record, the right is not constitutional and beyond the power of the General Assembly, are questions not discussed in this case, and, in the view we have taken of it, become unimportant in its decision.

It is urged by appellants, that the court below had no power to entertain jurisdiction of the case, or to issue the writ, and that all which followed the filing of the bill was utterly void; that the want of power to entertain a bill in such a case, or to make the restraining order, rendered the whole proceeding void and of no effect, and, being void, appellants had the right to disregard its requirements, and to proceed to the performance of a plain duty required of them by the statute, although in violation of the restraining order of the court. This we understand to be, in substance, the position assumed by appellants.

On the other hand, appellees insist, that if the court had power, as contradistinguished from mere jurisdiction, to entertain a bill to review the canvass of election returns in any case, and to correct frauds, accidents or mistakes, then the want of jurisdiction in the particular case did not affect the power to issue the writ; that the court had power, and had exercised it in contested county seat cases, independent of statutory authority, and as an inherent power, or, if not inherent, a power derived from the constitution, and hence the court had power in this case to issue the writ and punish those refusing to observe its requirements, or for disobedience

to its commands, as a contempt of the authority of the court and the State.

Thus, it is seen, that a question of much interest, and, it may be, of great importance, is presented for consideration. It is a question of how far a court of equity may use its powers to relieve against frauds, accidents or mistakes in elections, where its action must determine which of two persons shall fill an office, or, as in this case, which of two forms of local government shall control the people of this municipality. If the election may, in this case, be thus contested, and the municipal officers and others be restrained from performing the functions and duties imposed, until, by the tedious process of taking depositions and preparing the case for trial, the case can be heard in the court below, and an appeal, with the incident delays, may be heard, years would, in all probability, elapse, before the government chosen by the people could, in many instances, go into operation. Hence, it is the policy of the law to afford a more speedy and a less expensive mode of settling these contests.

If the court may exercise this jurisdiction in cases of doubt, or even where there is no doubt of the result, a few contentious and not over-scrupulous persons might, and probably would, be induced, from the heat and strife always engendered in such elections, to resort to a bill and an injunction, and thus, for years, thwart the will of the people, which the General Assembly has made absolute in adopting or rejecting this charter for their government. Public policy does not require such a jurisdiction, even if it could sanction it. If the power were admitted, where would its jurisdiction end? Suppose a person were to conceive a law to have been unconstitutionally enacted, could he, by bill, restrain the Governor and all other officers from executing it until a hearing could be had and the law declared valid? Suppose a citizen, in his hostile opposition to a Governor elect, or from other motives, were to conceive that he had obtained his apparent majority by fraud, could he apply to a court for and obtain an injunction

to restrain him from becoming inaugurated, until, by delays and appeals, the term for which he had been elected should expire, and thus defeat the will of the people?

Again, suppose a constitutional convention were called, a constitution adopted and submitted to the people for ratification or rejection, and the vote were in favor of adoption, could a bill be filed to prevent the Secretary of State from canvassing the returns, because fraud was alleged, until the vote of every county could be contested, purged, and new returns were made and a trial were had, after long and vexatious delays?

Can it be said that the two houses of the General Assembly may be restrained, by injunction, from the enactment of laws, because a portion of the members may have procured their seats by fraud, or one or both of the houses have, or are supposed to have, been illegally or even unconstitutionally organized? Can the Supreme and other courts be restrained from proceeding with the business before them because it may be supposed that the judges have obtained their seats by frauds in the election, or some statutory requirement has been omitted? Or may such a course be pursued in a large number of other like cases, which would defeat the will of the people constitutionally expressed? To so hold would be revolutionary. Such propositions can not be maintained, as it would largely give control of the political power of the State to the courts, a department not designed, either directly or indirectly, to exercise or control that power. But it is believed no one would contend for such power in the courts. But the expansive force of precedent may be said to be almost unlimited. A decision is made as an exception to a rule, and soon it is pressed with vigor, as establishing a principle that would embrace cases falling within well defined rules, and, if adopted, would lead to the perversion of justice. Sanction the power in this case as inherent in the court of chancery, could any ingenuity suggest reasons which should forbid the application of the same rule

to every case we have supposed, or any election case where fraud is alleged? In this case, alleged fraud is the ground on which the power is urged; so would it be in those cases, and the fraud would be precisely the same in each.

Whilst the writ of injunction is one of the most important in the law, by affording preventive relief,—in fact, is indispensable to the complete administration of justice,—it is one, from the facility with which it may be obtained, that is liable to great abuse, when granted to temporarily restrain the action of parties until a hearing is had. And the whole tendency seems to be towards its improvident use and consequent abuse. Whilst its use is absolutely essential to the administration of equitable relief, it has its limits, and the policy would not be wise, nor would it promote justice, to extend its use to cases of doubtful right, or to accomplish ends where there are other adequate remedies. The whole tendency of our jurisprudence has been to enlarge its scope, and it is now used in cases where, formerly, no one supposed it could be rightfully applied, and the present tendency is to a point which, when reached, will compel the General Assembly to intervene to restrain the abuses it will produce, and it is all believed to have grown out of the expansion of precedents not infrequently of doubtful correctness.

Having stated these general propositions, we now come to the consideration of the question, whether the court below had power, as contradistinguished from mere equitable jurisdiction growing out of the facts charged in the bill, to award the temporary injunction. To the complete authority to so act, there are several things which are indispensable to enable the court to hear, to determine and decree. There must be a complainant, who must file a bill alleging facts showing that he has an interest in the matter in litigation, or at least to complain, and have relief for others; there must be a matter about which rights are claimed, and that matter must be within the power of the court, when properly before it, to act upon or control it by its sentence, before it can adjudge and

decree that parties shall be restrained from acting in reference to the thing in litigation. If any or either of these essential requirements is wanting, the court can not decree that a restraining order shall issue.

In this case there was a complainant, who had exhibited a bill, and there was a subject matter for litigation, and the controling question is, whether the court, under any circumstances, could have power to hear, determine and decree in reference to it. If not, then the whole proceeding was *coram non judice.*

The law under which this election was held, neither in terms nor by implication confers the power. Nor is it asserted that the court had facts before it which required it to take judicial cognizance, and hear, adjudicate and decree. On the contrary, the court refused to continue the injunction, thus virtually deciding that the court was powerless to afford the relief sought, and thereby permitting the injunction to come to an end by the terms of the order awarding it, and we are clearly of opinion that it was not a case for equitable interposition. The act itself provides, section 57, article 4, p. 217, R. S. 1874, that : " The manner of conducting and voting at elections to be held under this act, and contesting the same, the keeping of poll lists and canvassing the votes, shall be the same, as nearly as may be, as in the case of electing county officers under the general laws of this State." The 98th section of the Election Law (R. S. 1874, p. 464,) provides for the manner of contesting the election of all county officers except the county judge, in the county court. Other sections of the act provide who may contest, how service shall be made, the trial had and conducted, and for the judgment to be rendered.

Thus it is seen there was complete, and, in every way, an ample remedy expressly provided for contesting this election under the statute, but it was not invoked. Hence there could be no pretense of jurisdiction from necessity. The remedy was obvious, plain and simple in its application, and being

ample and complete, there is not the slightest reason why equity should interpose and perform the functions of the county court, where the statute had placed it.

It has been held, that a court of equity has no power to try a contested election, even where the statute has not provided a mode for contesting. See *Moore* v. *Hoisington*, 31 Ill. 243. Elections belong to the political branch of the government, and are beyond the control of the judicial power. It was not designed, when the fundamental law of the State was framed, that either department of government should interfere with or control the other, and it is for the political power of the State, within the limits of the constitution, to provide the manner in which elections shall be held, and the manner in which officers thus elected shall be qualified, and their elections contested. And the political power of the State may organize municipal bodies and put them into operation by the force of enactment, or by election by the people to be thus governed, and they can provide the mode of reviewing the returns of all elections, to ascertain whether they are in accordance with the expressed will of the people. And until the courts are empowered to act, by the constitution or legislative enactment, they must refrain from interference.

But did the court have a general power to hear and determine as to the fairness of the result of elections in this class of cases, on the requisite facts being stated in the bill? If so, then the court had power over the subject matter, although the facts were so defectively stated as to fail to confer jurisdiction in the particular case. We think clearly not, because no state of facts, however stated, could confer power to adjudicate in that class of cases. We are aware of no adjudged case, or text writer, who has ever announced the power as inherent in the courts of equity, to try contested elections between persons claiming an office, or in a case of this character. It is believed that no case can be found, where an English court of chancery has ever tried a contested election where the public were concerned. And such cases are

believed to be of rare occurrence in this country, and then only where the power has been conferred by express enactment or necessary implication therefrom.

The first section of an act creating and defining the power, jurisdiction and practice of courts of chancery, provides that the courts shall have power to proceed in the exercise of their jurisdiction in the mode prescribed by the act;. and when there is no provision made by the act, then according to the general usage and practice of courts of equity. Now, it is not the general usage or practice of courts of equity to hear and determine contested elections, and if not, the power is not conferred by the Chancery Act, and none other has been referred to from which it can be derived.

But it is said that this court has held that chancery has power and could take jurisdiction to try a contested county seat election, and therefore such power might be exercised in this class of cases, or rather, this belongs to the same class of cases, and whether or not the facts charged in the bill conferred jurisdiction to hear and adjudicate, there was still the power in that class of cases, and if the power existed, the writ must be obeyed, without regard to what would be the result in the particular case. It is true that, in a number of county seat cases, we have held that chancery might take jurisdiction and hear and determine them. But the power was placed expressly upon the ground that the constitution had provided that county seats should not be removed except on a vote resulting in a majority in favor of a removal; and the General Assembly, in providing for the mode of holding such an election, wholly failed to provide for any means of contesting it. And, to prevent the obstruction and a defeat of the rights of the majority, conferred and intended to be secured to them, it was held, that the fundamental law, by implication, conferred the power on the courts of chancery. But, in making these decisions, it was on that express ground, and those cases thereby became an exception to all other cases. If these decisions recognized them as a class of cases, they

only recognize county seat questions as being embraced in the class, and nothing was intended to be, nor do we think anything was, said which can, by fair intendment, be construed to embrace any other character of election cases. They can not be held to extend the power to other or different cases. The power therein flowed solely and entirely from the constitution.

But in this case there is no pretense that this or like elections were required to be held by any provision of the constitution, nor that the statute had not provided a means for contesting them. Hence this case lacks these essential elements to bring it within the scope of those decisions. Being an exception to all other cases or classes of cases, they afford no precedent, nor do they establish any principle that can embrace this case, or in the remotest degree affect or control its decision.

It then follows, if what we have said is correct, that the court below had no power to hear and adjudicate in this class of cases. And having no power under any head of his jurisdiction, the chancellor acted wholly without power to entertain the bill for any purpose, or to award the writ of injunction. Wanting both power and jurisdiction to entertain the bill or award the writ, it was a nullity, which could legally operate on no one, nor was any one bound to yield obedience to its requirements. Having been issued without power, it was as inefficient as if it had been issued without any bill presented, or as though no person had ever asked for it. Not having power, the writ was no more binding than would be a decree in a criminal case, and for the same reason, the want of power.

Where power to take judicial cognizance is wholly wanting, all power to judicially bind or affect the rights or interests of parties is wanting; and whilst the powers of the chancellor are great and expanded, still they have their limits, and, when transcended, all acts beyond the limit are abso-

18—78TH ILL.

lutely void, and can have no binding effect, and the awarding of this writ falls within, and is of that character.

In the case of *The People* v. *The City of Galesburg*, 48 Ill. 486, it was held that a court of chancery had no power to enjoin the holding of an election.

Again, in the case of *Moore* v. *Hoisington*, 31 Ill. 243, it was held that a court of chancery has no power to try a contested election, even where the statute had provided no mode of contesting.

In *Walton* v. *Develing*, 61 Ill. 201, it was held, where an injunction was issued to restrain officers from holding an election, and it was disobeyed, that they were not amenable to the process or liable to be punished for a contempt in disobeying the writ. And it was upon the grounds that the writ was void for the want of power, and the law required the officer to perform this particular duty. The distinction was there taken that, where the court has power over the subject matter, and authority to take such jurisdiction, and the court acts, its process must be obeyed; but where the power is wholly wanting, then the process is void, and need not be obeyed. The same rule was recognized and applied in *Darst* v. *The People*, 62 Ill. 306. So the doctrine is by no means novel in this court.

It is true that officers and others may be embarrassed as to their course of action in such cases. They must act at their peril under all such circumstances. They can, as the parties did in this case, call to their aid able counsel, learn their duty from all available sources, and then act and abide the consequences. If the advice they procure be wrong, it will be their misfortune, and the incorrect advice will not excuse the offense or mitigate the punishment.

We have confined ourselves to the adjudged cases in our own court, and to general and well recognized legal and equitable principles, not only because we regard them as settled, but because we do not in the least doubt their entire correctness. Hence we have not reviewed the numerous authorities

of other courts and text writers incidentally bearing on the question presented in the very elaborate and unusually able arguments of counsel. But, notwithstanding their industry, research and ability, we have been irresistibly impelled to reach the result here announced.

The entire record considered in the light of the arguments, we must say that the court below transcended its powers in awarding the writ, and, as a consequence thereof, in fining the defendants as for a contempt of the process of the court and the authority of the State; and the several judgments imposing such fines must be reversed.

*Judgments reversed.*