[No. 461. January Term, 1891.]

## IN THE MATTER OF JOHN H. SLOAN AND TEODORO MARTINEZ.

HABEAS CORPUS—MANDAMUS—INJUNCTION—JURISDICTION OF DISTRICT
COURT.—On an application for a writ of habeas corpus, by certain
members of the board of county commissioners of Santa Fe county,
for release from commitment, for refusal to pay fines assessed against
them for contempt of court in refusing to obey a writ of injunction,
issued in a certain mandamus proceeding, restraining them from
issuing certificates of election to any other persons than those men-
tioned in the writ, and from making any record of the result of their
canvass of election returns, on the ground of want of jurisdiction of
the court over the subject-matter of the proceeding—Held: Under
section 13, chapter 135, Laws, 1889, prescribing the duties of the
board of county commissioners, sitting as a canvassing board, and
providing that, in case of their failure or refusal to perform those
duties, the district judge shall, on the petition of any qualified voter,
issue a writ of mandamus to compel a performance, the district court
had jurisdiction of the subject-matter of the mandamus proceeding,
and the power to issue a writ of injunction therein in aid thereof.

If there were any doubt as to this power in the district court, that doubt would be removed by section 1, chapter 117, Laws, 1889, providing that suits in equity may be begun, injunctions granted * * * in aid of any suit at law * * * which took effect on the same day as did the statute supra. The term "suit at law" is used in its broadest sense, and was intended to authorize the aid of equity in any pending legal proceeding whenever necessary to give a more complete and effectual remedy.

ID.—CONTEMPT—FINES—IRREGULARITY IN ASSESSMENT OF.—The fact that the court, in the proceedings for contempt against the petitioners, for refusal to obey the writ of injunction in the mandamus proceedings, assessed several different fines for several distinct offenses in the same proceeding, would not make void the entire punishment. It was a mere irregularity, curable in the court in which the proceeding was had, or by appeal, and not on habeas corpus.

ID.—CONTEMPT—JURISDICTION IN VACATION.—The objection of want of jurisdiction in the court in vacation is not tenable. Under section 1829, Compiled Laws, the courts of the territory are always open, and their jurisdiction is broad enough to include proceedings for contempt.

PETITION for writ of habeas corpus.   Writ denied, O'BRIEN, C. J., dissenting.

The facts are stated in the opinion of the court.

FRANCIS DOWNS, N. B. LAUGHLIN, THOMAS SMITH, and HARRISON BURNS for petitioners.

EDWARD L. BARTLETT, solicitor general, and JOHN H. KNAEBEL for the territory.

McFIE, J.—On the twelfth day of January, A. D. 1891, on petition of John H. Sloan and Teodoro Martinez, alleging, in substance, that petitioners were unlawfully confined and restrained of their liberty by the sheriff of Santa Fe county, a writ of habeas corpus issued out of this court, directing Francisco Chavez, sheriff of Santa Fe county, to bring the petitioners before this court, to show cause why petitioners should not be discharged.   The record discloses all of the proceedings had before Edward P. Seeds, associate justice

of the supreme court of the territory of New Mexico, and judge of the First Judicial District court thereof, of which the county of Santa Fe forms a part, sitting in chambers in the city of Santa Fe, in said county, in a certain mandamus proceeding, number 2808, filed November 12, 1890, entitled "The Territory of New Mexico ex rel. Benjamin M. Read v. John H. Sloan, George L. Wyllys, and Teodoro Martinez, board of county commissioners of Santa Fe county," and a certain proceeding by injunction, number 2809, filed November 12, 1890, entitled "Benjamin M. Read, Joseph B. Mayo, and Thomas B. Catron v. John H. Sloan, George L. Wyllys, and Teodoro Martinez." Upon the hearing, January 23, A. D. 1891, no technical objections were raised to the formality of the proceedings, but, on the contrary, counsel for petitioners denied the jurisdiction of the court over the subject-matter, and the power of the court to issue the process by which petitioners were held, and contended that the same was void. The facts out of which this controversy grows are pretty fully stated in the application for injunction, which is as follows:

"Territory of New Mexico, county of Santa Fe. In the district court for the said county of Santa Fe, sitting for the trial of causes arising under the laws of said territory.

"To the Hon. Edward P. Seeds, associate justice of the supreme court of said territory, and judge of said district court.

"Benjamin M. Read, Joseph B. Mayo, and Thomas B. Catron, residents of said county, bring this, their bill of complaint, against John H. Sloan, George L. Wyllys, and Teodoro Martinez, also residents of said county, and show unto your honor: Complainants were candidates at the election held in said county on the fourth day of November, 1890, said Read and Mayo for the offices of members of the house of representa-

tives of the legislative assembly of New Mexico, and
said Catron for the office of member of the council of
said legislative assembly, and, as such candidates, were
voted for by voters of said county, and, as shown by
the election returns, received majorities of the votes
cast for said offices, respectively. Defendants are the
county commissioners of said county, and, as such, are
required by law, within six days after an election, to
publicly examine and count the votes polled for each
candidate, and to forward to the persons who have
received the greatest number of votes polled at any
election held for members of the house of representa-
tives the corresponding certificate of election. That
defendants have assembled at the courthouse in the
county of Santa Fe for the purpose aforesaid, but have
failed, neglected, and refused to count a portion of the
votes polled at said election for these complainants,
such portion being the votes cast for complainants in
the precincts of said county numbered 1, 2, 8, 11, and
16; the returns of election from said precincts being
before said defendants, and in regular and perfect con-
dition. The failure and refusal of defendants to count
said votes as shown by said returns will materially affect
the result of said count so as to make it appear that
persons other than complainants have been elected to
said offices, although such is not really the fact; and
defendants give out and threaten that they will make
and deliver, or cause to be made and delivered, to
such other persons, certificates showing their election
to the offices aforesaid, and complainants believe that
they will certainly do so unless restrained by an order
of this court. If such certificates are so made and
issued to such other persons, great and irreparable
damage may, and probably will, result to complainants,
and to each of them, and to the public generally, and
the existence of such certificates may, and probably
will, be the cause of numerous suits and vexatious and

expensive litigation, as has heretofore been the case in this territory under similar circumstances. As soon as the said count by defendants is completed, complainants will institute, or cause to be instituted, in accordance with the statute, proceedings in mandamus to compel defendants to canvass all of the returns of said election in said county; but before such proceedings can be made effective, and before the complete canvass can be made, defendants will issue, or cause to be issued, such improper and fraudulent certificates of election as hereinbefore described. Complainants therefore pray that defendants be restrained and enjoined by an injunction of this court from making and delivering, or ordering or causing to be made or delivered, any certificate of election to either of the offices hereinbefore mentioned to any person or persons other than these complainants, and from making, or causing to be made, any record of the result of their canvass of said election returns, until the further order of the court in the premises. May it please your honor to grant unto complainants the written subpoena, under the seal of this honorable court, directed to defendants, John H. Sloan, George L. Wyllys, and Teodoro Martinez, commanding them, and each of them, to appear before this court on a day and under a penalty to be therein fixed, then and there to answer unto the premises as fully as if the same were here repeated, and they particularly interrogated thereto, but not under oath, an answer under oath being hereby expressly waived, and to abide the order or decree of the court in the premises.          BENJAMIN M. READ."

"Territory of New Mexico, county of Santa Fe.

"On this twelfth day of November, A. D. 1890, personally appeared before me Benjamin M. Read, and made oath that he had read the foregoing bill by him subscribed, and knew the contents thereof, and that the same is true, except as to matters therein alleged

upon information and belief, and as to those matters
he believes it to be true.

"Witness my hand and the seal of the district
court of the First Judicial District of the territory of
New Mexico, the day and year last above written.
[SEAL]     "A. E. WALKER, Clerk District Court."

The writ of injunction is as follows:

"The territory of New Mexico to John H. Sloan, George
     L. Wyllys, and Teodoro Martinez, greeting:

"Whereas, Benjamin M. Read, Joseph B. Mayo,
and Thomas B. Catron have filed in the district court
for Santa Fe county their bill of complaint against you,
praying to be relieved touching the matters therein set
forth, now, therefore, you, the said John H. Sloan,
George L. Wyllys, and Teodoro Martinez, both indi-
vidually and as members of the board of county com-
missioners of Santa Fe county, your agents, servants,
employees, and advisers, are hereby restrained and
enjoined from making or delivering, or ordering or
causing to be made or delivered, any certificate of
election to the offices of members of the house of rep-
resentatives of the legislative assembly of the territory
of New Mexico, and of member of the council of said
legislative assembly, to any person or persons other
than said Benjamin M. Reid, Joseph B. Mayo, and
Thomas B. Catron, and from making or causing to be
made any record of the result of your canvass of the
election returns of the election held in said county of
Santa Fe on the fourth day of November, 1890, until
the further order of said district court in the premises.
Witness the Honorable Edward P. Seeds, associate
justice of the supreme court of the territory of New
Mexico, and judge of the First Judicial District Court
thereof, and the seal of said district court, this twelfth
day of November, 1890.
[SEAL]                    "A. E. WALKER, Clerk."

The injunction not having been dissolved, but remaining in force, two affidavits were filed in the cause setting forth the disobedience of the writ of injunction by two of the said county commissioners, John H. Sloan and Teodoro Martinez. Thomas B. Catron, one of the complainants, filed his petition setting forth the violation of the injunction by two of the commissioners, Sloan and Martinez, and prayed that they should be punished for contempt. The court ordered Sloan and Martinez brought before the court by attachment, and upon hearing they were each fined in the sum of $200, and costs, and ordered to be imprisoned in the county jail until fine and costs were paid. The petitioners refused to pay the fine and costs assessed against each of them, and were put in jail by the sheriff. To avoid payment of the fines assessed, and costs, and be discharged from imprisonment, petitioners have sued out this writ of habeas corpus. The law governing the mandamus proceedings in this case is section 13, chapter 135, Laws, 1889, and took effect February 28, 1889. In compliance with that section, Mr. Read filed his sworn petition on the twelfth day of November, 1890, alleging the refusal of John H. Sloan, Teodoro Martinez, and George L. Wyllys, as such canvassing board, to count the returns from certain precincts named; and the court granted an alternative writ of mandamus requiring the canvassing board to proceed to either canvass the returns from the precincts named, and declare the result, or to appear in person forthwith before said district court, and bring with them all of such returns, and all of the returns or papers purporting to be returns. The board, accompanied by counsel, appeared before the court on the following day, and filed an answer stating in full their reasons for declining to canvass the returns, and declare the result, as directed by the court. and asked to be discharged. On application of counsel for the relator a peremptory writ of mandamus, as to

the canvassing of precincts 1, 2, 16, and 8, was issued November 18, 1890, returnable November 19, 1890, but the record shows no further proceedings, nor compliance with said peremptory writ. A bill of exceptions was filed by the respondents on December 5, 1890, and the cause is now in this court.

Having thus fully stated the record, we will now consider the law applicable to this cause. It is insisted on behalf of the petitioners that the court had no jurisdiction of the subject-matter, and, therefore, the writ of injunction was void; and being void, admitting that the petitioners had disobeyed the writ, there could be no contempt. It may be admitted that, if the court had no jurisdiction of the subject-matter—that is, an absolute lack of power—then there could be no contempt in disobeying the order of the court, because the order and process of the court was void. The authorities are abundant in support of this proposition. It is contended on behalf of the officer that the court had complete jurisdiction in the premises; that the petitioners are not illegally restrained, and should be remanded. A large number of authorities have been cited, and an examination of them emphasizes the necessity of keeping in mind the distinction between the entire want of power conferred by jurisdiction and the erroneous exercise of or the propriety of exercising, the power conferred. Courts of equity have very large discretionary powers, and in the exercise of that discretion they have declined to exercise a jurisdiction and power which would have been exercised had a proper case been presented. No positive and inflexible rule can be laid down regulating the jurisdiction of courts of equity, or whether jurisdiction shall be exercised or declined, inasmuch as the circumstances of each case must be taken into consideration in determining these questions. Nor can the authorities of one state be relied upon as settling these

*HABEAS corpus: mandamus: injunction: jurisdiction.*

questions for another, for the reason that there may be constitutional or statutory limitations or enlargements of jurisdiction not common to all; thereby necessitating a careful examination of the law as applied to the facts of each case.

In this case it is insisted that the court had no jurisdiction, because the petitioners were acting as a board of canvassers of an election; that they had discretionary powers; that they constituted an independent political power, and were free from the interference of the judicial power. The case of Dickey et al. v. Reed et al., 78 Ill. 261, is relied upon as conclusive in this case. In that case an election had been held to determine whether the city of Chicago should become incorporated under the general incorporation act, or remain under its charter; or, as the court says, the election was to determine "which of two forms of government it should have." A bill in chancery was filed, alleging fraud and irregularity in the election, not in the returns, and prayed an injunction restraining the canvassing board from canvassing the returns of the election then in their possession. This was properly denominated a "bill to contest the election," which courts of chancery usually decline to entertain; but the injunction sought to restrain the board from doing a legal duty which the statute of Illinois imposed upon it,—to canvass the returns. The lower court granted the injunction, but the supreme court held that the court had no jurisdicton of the case. There is a marked distinction between the proceedings in that case and the case here, namely: That was a bill in chancery to contest an election; this was not. The injunction in that case was to prevent the board from performing a legal act and duty; the injunction in this case sought to prevent the board from doing an illegal and fraudulent act. There is also a material difference between the law then in force in Illinois and the laws of this

territory, in that in this territory the statute expressly
makes it the duty of the courts, when the county com-
missioners, sitting as a canvassing board, fail or refuse
to canvass all of the returns, on its being brought to
the attention of the court, to compel the board to
canvass all the returns.   Section 13 of chapter 135 of
the Laws of 1889 is as follows: "That the board of
county commissioners, sitting as a canvassing board
for the purpose of canvassing the returns of any elec-
tion hereafter held in this territory, shall not adjourn
or become functus officio as a canvassing board until
such board of commissioners shall have canvassed each
and every return of election before them, and shall
have declared the result from the face of such returns;
and if any board of county commissioners, sitting as a
canvassing board, shall fail, neglect, or refuse to can-
vass any return of any election before said board under
any pretense that such return is irregular, or for any
other pretense, it shall be lawful for any qualified voter
to present his petition under oath to the judge of the
district court having jurisdiction, at his chambers,
briefly setting forth the facts and circumstances, and
praying that such board of commissioners shall be
required by writ of mandamus issuing out of said
court to count and certify such returns.   And, there-
fore, it shall be the duty of the district judge to imme-
diately issue, or cause to be issued, his alternative writ
of mandamus requiring said commissioners either to
canvass such return or returns and to declare the
result, or to appear in person forthwith before said
court, and bring with them all of such returns; and,
if such commissioners shall decline to canvass such
return or returns, they shall appear before said court in
obedience to such writ, and take with them all of the
returns or papers purporting to be returns before them,
and thereupon the court shall forthwith proceed to
examine said returns, and upon such examination may

issue his peremptory writ commanding said board of commissioners to immediately canvass any or all of such returns, and to declare the result."

Evidently, the legislature of this territory, profiting by experience, intended to place it within the power of one voter of a county to invoke the aid of the courts to compel canvassing boards, when canvassing election returns, to do their duty, if they either fail, neglect, or refuse to do it. The object of the law is to ascertain the will of all the people as expressed by them by their ballots, even from an unscrupulous or unwilling board of canvassers, and to preserve the rights of the people, individually and collectively, as well as prevent fraud and injury. Canvassing boards may fail, neglect, or refuse through ignorance; and, upon proper application, the court is required to direct them. Boards of canvassers have a ministerial duty to perform under this law, and that is to canvass "each and every return of election before them, and shall have declared the result from the face of such returns." This law gives the courts power to see that this duty is performed, and the undoubted right to issue the necessary writs of mandamus compelling its performance. The record shows that it became necessary to invoke the remedy provided by this law, but that it was unavailing.

The power of the courts to compel boards of canvassers to do their ministerial duty by canvassing the returns and declaring the results in election cases is sustained by numerous authorities without the aid of such an explicit law as the law of this territory. In the case of State ex rel. Metcalf v. Garesche, 65 Mo. 480, the court says: "Having ascertained what was the true return, and that the canvassing officers had failed or refused to count it, thus leaving their legal duty unfulfilled, the peremptory writ commanded its performance. It will thus be seen that the right to deter-

mine the specific legal duty of ministerial officers, such as defendants are, necessarily results from the very nature of the proceeding by mandamus. It simply requires the judicial officer to proceed to do his duty. It not only requires the ministerial officer to proceed to do his duty, but it also indicates what his specific duty is. To assert that the writ of mandamus can not require the performance by a ministerial officer of any act which he does not, with the lights before him, conceive it his duty to perform, is to destroy the efficacy of the writ, and to substitute the conscience of the officer for the command of the law." The supreme court of Wisconsin has decided that a board of canvassers can be compelled to determine, in accordance with law, which one of the candidates at an election in that state for the office of representative in the congress of the United States is entitled to the certificate of election, and that this does not contravene the constitutional power of the house to determine its member's right to the office; the court merely deciding whether the returns made by such board of votes cast in a county should be included in their canvass and statement. State v. Board of Canvassers, 36 Wis. 498. Mr. McCrary, in his work on Elections (section 350), says: "The courts will not undertake to decide upon the right of a party to hold a seat in the legislature when by the constitution each house is made the judge of the election and qualifications of its own members; but a court may, by mandamus, compel the proper certifying officers to discharge their duties, and arm the parties elected to such legislative body with the credentials necessary to enable them to assert their rights before the proper tribunal. And inasmuch as canvassing and returning officers act ministerially, and have no power to go behind the returns, or inquire into the legality of votes cast and returned, a court will, by mandamus, compel them to declare and certify

the result as shown by the returns, because that is a
plain duty; but the award of a certificate of election
under such mandate will not conclude the legislative
body in determining the election." O'Ferrall v. Colby,
2 Minn. 180.

These authorities, and many others that might be
cited, make clear the duties of these canvassing boards,
and the power of the courts to compel them by manda-
mus to do their duty, and the further fact is shown
that such proceeding is not an election contest, nor
does it try the title to an office. It simply compels a
canvass of the returns, and a declaration of the result
as shown by the face of the returns, regardless of who
is elected or defeated. The numerous authorities in
Illinois and elsewhere to the effect that the courts of
equity have no jurisdiction in a case of contested elec-
tion, and that injunction will not restrain the holding
of an election, or try the title to an office, are not
applicable here, and will be better understood if the
above distinctions are kept in mind. As stated in the
case in 78 Ill., there are certain political powers per-
taining to the co-ordinate departments of government
that are independent of judicial power, and therefore
can not be controlled by the courts, which proposition
excludes all courts; but the power of the courts may
be invoked in aid of political administration to compel
the performance of specific legal duties. Wherever,
therefore, the door is open to judicial supervision, then
all of the power of the courts necessary to make the
remedy effectual is available. If equity is necessary
to uphold the common law, it has a clear right to act
by reason of the ancillary character of its functions.
Under the statute of the territory above referred to,
there can be no doubt of the power and jurisdiction of
the court in the mandamus proceeding, nor can there
be any reasonable doubt as to the fact hat the legisla-
ture, in passing that act, intended to compel county

commissioners, when sitting as a canvassing board, to declare the true result of an election from the face of all the returns, and that the judge of the proper district court, if called upon as provided by the law, should compel it to be done in case of failure, neglect, or refusal. It is clear, also, that such board is prohibited from canvassing less than all of the returns, and that they are forbidden to certify to false results, based upon a canvass of part of the returns. Therefore, if the law is obeyed by canvassers, all parties will secure the rights to which they were entitled by the result of any such election.

It was urged in argument on behalf of the petitioners that the court had no power to control the discretion of petitioners when they were acting as canvassers of election returns; but an examination of the statute shows that they had no discretionary powers. The statute commanded them to canvass all of the returns, and declare the result from the face of the returns; therefore the argument fails to point out a want of power in the court in this respect. Counsel for petitioners also contend that petitioners are answerable alone to their consciences and their constituents for failure or refusal to properly discharge their duties as such canvassing officers; but this contention is conclusively answered by the statute on the subject, and need not be further noticed. Sadly defective, indeed, would be a law which placed the rights and interests of the people of a county in the hands of (it might be) an irresponsible and unscrupulous board of canvassers, who were accountable only to their consciences and constituents. Fortunately, the law of this territory is not thus defective. Jurisdiction in regard to election matters having been specifically conferred upon the courts of this territory, it is difficult to see how the case of Dickey et al. v. Reed et al. 78 Ill., becomes authority in this case; for in that case it was held that

jurisdiction had not been conferred, and therefore the
process was void. The failure to exercise the power
conferred does not destroy the power. That is clearly
shown by the case of Neiser v. Thomas et al., 12 S. W.
Rep. 725, in which the court refuse to take jurisdic-
tion, but say that they do not wish it to be understood
that they would not exercise jurisdiction, even in an
election case, upon the presentation of a proper case.
That was an injunction case, but was really an attempt
to contest an election, and sought to have Mr. Thomas'
right to the office of city marshal of St. Louis set aside
on the ground that he was disqualified. To determine
this question, evidence must be heard; and hence it
was simply an attempt to try a contested election case
in an equity court, and jurisdiction was properly de-
clined. If we accept the view of the Illinois case con-
tended for by counsel for petitioners,—that canvassing
boards, in election matters, are an independent and co-
ordinate political power, absolutely free from the
jurisdiction of the courts,—what means this array of
decisions of able courts, both of law and equity, in
which they have taken and exercised jurisdiction in
election cases, and especially as to canvassing boards?
It seems to us that the contention is erroneous and that
the Illinois court declined jurisdiction under the law of
that particular state as applied to the case presented to
the court. The fact that some courts exercise juris-
diction in election cases, while others do not, serves to
prove that the courts await the presentation of a proper
case before attempting to exercise an existing power;
and, further, that while there are election cases of
which the courts of equity will refuse to take jurisdic-
tion, owing to the particular phase of the case pre-
sented, still there are very many phases of election
cases of which courts both of law and equity will take
and exercise jurisdiction. Numerous cases are reported
showing the power of the courts over canvassing

boards, and our statute gives the courts comprehensive jurisdiction over them.

This brings us to the consideration of the injunction proceeding in the light of what has been said. The bill alleged, in substance, that at the election held in Santa Fe county, November 4, A. D. 1890, Benjamin M. Read and Joseph B. Mayo were each candidates for the office of member of the house of representatives of the legislative assembly of New Mexico, and that Thomas B. Catron was a candidate for member of the council of said legislative assembly; that they were voted for at said election, and that the returns showed that they had received a majority of the votes cast at said election for such offices; that petitioners and one George L. Wyllys were the commissioners of Santa Fe county, and were by law required to canvass the returns of said election within six days after the election, declare the result, and forward certificates of election to those having received a majority of the votes cast; that the said board had assembled, but that they had failed, neglected, and refused to count the returns from precincts 1, 2, 8, 11, and 16 of said county, although the returns from these precincts were before the board in regular and perfect condition; that the failure of the board to count the returns from those precincts would materially affect the result by showing that other persons than complainants were elected, when, in fact, complainants had received a majority of the votes cast; that said commissioners had threatened to declare the result from a partial canvass, and issue certificates to others than complainants for said offices; that, if such certificates were issued, great and irreparable damage will be the result to complainants and the public generally; that it may, and probably will, result in causing numerous suits and expensive and vexatious litigation; that complainants will institute mandamus proceedings

to compel the board to canvass all of the returns, but that before such proceedings can be made effective the board will issue, or cause to be issued, such fraudulent certificates. Upon this bill a writ of injunction issued, as above set out. This bill brought to the court's attention a case where a board of canvassers had refused to obey the law, and not only that, but that they were about to do a plainly illegal act, and perpetrate a fraud, liable to cause a multiplicity of suits and great injury, which could still be prevented by the prompt action of the court. The court was bound to know the law, and that the act about to be committed was plainly illegal and fraudulent. The bill alleged that the canvassers had refused to canvass the returns from five precincts, although the returns were before them in "regular and perfect condition;" and the court was bound to know that the law commanded this board to canvass all of the returns, and declare the result from a canvass of all the returns, and that it was an illegal act to issue certificates of a result declared from a canvass of part of the returns. While county commissioners have large discretionary powers, this canvassing board had no discretion whatever, under the law as to that particular matter. They had a specific duty to perform. They had refused to perform it, and were about to declare a false result, and issue certificates, the legal effect of which the court was bound to know. Referring to the law of this territory on this subject, we can not refrain from commending the wisdom of the legislature in enacting it. It strikes directly at the cause of the vexatious litigation and disorder,—the discretionary powers of canvassing boards. This law provides that the county commissioners, when sitting as a canvassing board for the purpose of canvassing the returns of any election held in this territory, shall not adjourn or become functus officio as a canvassing board until they "shall have canvassed each and

every return of election before them, and shall have declared the result from the face of such returns." The will of all the voters as shown by the returns must be declared by the canvassing board. In case of a candidate for office, he has a legal right to this declaration; and if, by this declaration, a candidate has received a majority of the votes, the certificate must be issued to him, and it is an illegal act to deprive him of this evidence of his title to office. As was said in O'Ferrall v. Colby, 2 Minn. 180: "But a court may, by mandamus, compel the proper certifying officers to discharge their duties, and arm the parties elected to such legislative body with the credentials necessary to enable them to assert their rights before the proper tribunals." This does not necessarily give the candidate the office—indeed, he may never obtain it; but he has a right to have what the law gives him from the canvassing board. The record shows that the mandamus proceeding was before the court at the time this bill for injunction was presented, as it bears an earlier number upon the docket; hence the court was informed that it might become the duty of the court to compel the board to declare a different result from that upon which the board was about to issue certificates, so that the court, by refusing to restrain the issuance of illegal certificates, would practically become a party to the transaction. It was the plain duty of the court, and it had full power to prevent certificates from being issued until such time as, by the remedy pointed out by the statute, it could be definitely ascertained what the result of the election was, and to whom certificates should be issued by the board. The bill in this case sought to restrain the doing of a fraudulent act. It sought to prevent vexatious and expensive litigation, and it pointed out the necessity for prompt relief. But it is urged that there is want of jurisdiction, because there was a remedy at

law. That there is a remedy at law is not sufficient. It must be an adequate remedy. Under the law of this territory, the remedy at law was not an adequate remedy in this case. If this had been a bill to contest an election, or try the title to an office, there would be force in the contention; but it is not a case of that kind. The law of this territory clothes the courts expressly with full power, when properly called upon by a taxpayer of the proper county, to grant the writ of mandamus, both alternative and peremptory, to compel canvassing boards to do their duty, if they fail, neglect, or refuse to do it. That duty is to canvass each and every return before them, declare the result from the face of the returns, and, under section 1193, they must issue certificates to the persons having the greatest number of votes for the particular office. In other words, the canvassing board must give to the person receiving the greatest number of votes (at an election for officers), after they have ascertained from an honest canvass of all the returns, the certificate which is prima facie evidence of his title to the office, and it also secures to the people an honest expression of their will. Any other canvass, or the issuing of any other certificate, would be a gross fraud upon both the person voted for and the people. But for the intervention of equity in such a case as this, prima facie evidence of title to the same office may be given to more than one person by unscrupulous officials, and if so the very purpose of the law would be defeated. As the law applies equally to all election returns, it follows that the rights acquired by a candidate for election to office at an election in this territory are to be preserved from their inception, and the right of a person elected to office in this territory is to have the legal evidence of that right which the canvassing board are required by law to give him, and, further, that such legal evidence of right to the office shall not be given to

another.   The policy of the law is to deprive canvass-
ing boards of their power to do harm, such as the bill
shows was about to be done.   The court in South Car-
olina, in the case of Grier v. Shackleford, 3 Brev. 491,
speaking of the duty of election managers:  "It is not
to be believed that the legislature intended to hang
the most important rights of the citizen on the arbi-
trary decision of such a tribunal.   If they are to range
through all the vagaries of their capricious fancies,
the elective franchise will become an idle mockery."

Is it an adequate remedy for a candidate, having
received the greatest number of votes, to be compelled
to contest before the legislature a defeated candidate,
having prima facie evidence of title to the office given
him in violation of law?   Plainly, it is not.   The law
commands the board, and, if they refuse, the court
must compel the board, to give the successful candidate
prima facie evidence of his right to the office, and it
is for the defeated candidate to resort to quo warranto
or contest, as the case may be.   These remedies may be
adequate for the defeated candidate, but they are not
for the successful candidate.   The legislature of a ter-
ritory is limited in its sessions to sixty days, and com-
pensation is paid to the sitting member.   Suppose a
board of canvassers gives a certificate of election to a
defeated candidate; he presents it, and takes his seat;
contest is brought by a successful candidate, but by
delay it is not decided prior to adjournment.   Where
is the remedy for the candidate who was actually
elected?   Evidently, such is not an adequate remedy.
If the board of canvassers do their duty, the success-
ful candidate will receive prima facie evidence of his
right to the office.   If the unsuccessful candidate desires
to question the result, he may resort to the appropriate
remedy, go behind the returns, and then the case has
reached what is regarded in law as a "contested elec-
tion case."   "Except in cases of special injunction

to stay waste or prevent other irreparable injury, the bill should generally show some primary equity in aid of which the injunction is asked, and the relief is granted as ancillary to or in support of the primary equity whose enforcement is thus sought." Patterson v. Miller, 4 Jones Eq. 451; Washington v. Emery, Id. 29. "And it is incumbent upon the party seeking relief by interlocutory injunction to show some fair legal or equitable rights, and a well grounded apprehension of immediate injury to those rights." High Inj., sec. 7. "Where, however, the parties are at issue upon a question of legal right, and it is necessary to preserve their rights in statu quo until the determination of the controversy, an interlocutory injunction may properly be allowed." Harman v. Jones, Craig & P. 299. In such cases courts of equity do not assume jurisdiction to dispose of the legal rights in the controversy, but confine themselves to protecting those rights as they are, pending an adjudication upon the legal questions involved. In Kerr et al. v. Trego et al., 47 Pa. St. 292, involving elections and offices in the city of Philadelphia, the supreme court granted an injunction, and said: "The remedy by injunction extends to all acts that are contrary to law, and prejudicial to the interests of the community, and for which there is no adequate remedy at law." The supreme court of Illinois, which decided the case of Dickey et al. v. Reed et al. has frequently granted injunctions in county seat election cases, holding that, while they had no statutory authority, the authority was implied by the constitution.

If there could still be any doubt of the power of the court of equity over the subject-matter of this injunction proceeding, we think it is at rest by virtue of another statute of this territory, which took effect on the same day the former statute referred to took effect. Section 1, chapter 117, Laws, 1889, is as follows:

"That suits in equity may be begun, injunctions granted, or receivers appointed in aid of any suit at law, whether the same has been prosecuted to a judgment or not; provided, that such suit at law has been begun at the time any such equitable relief is sought." It is objected that the mandamus proceeding was not a suit at law; but, while in a strict sense it is not an action at law, we are of the opinion that the term "suit at law" is used in its broadest sense, and that it was intended to authorize the aid of equity whenever it was necessary in order to give a more complete and effectual remedy in any pending legal proceeding. The word "suit" is a very comprehensive term. As used in the judiciary act, 1789, section 25, it was construed to mean "any proceeding in a court of justice in which the plaintiff pursues to such court the remedy which the law affords him." "An application for a prohibition is a suit." 2 Pet. 449. "In its most extended sense, the word 'suit' includes not only a civil action, but also a criminal action." Story. Const., section 1719; 1 Chit. Pl. 399. " 'Suit' applies to proceedings in chancery, as well as law" (1 Smith Ch. Pr.); "and is, therefore, more general than 'action,' which is almost exclusively applied to actions at law" (Didier v. Davison, 20 Paige, 516). The term as used in the statute is to be construed in its comprehensive sense, and comprehends proceedings ancillary to the remedy by mandamus, as authorized by section 13, chapter 133, Laws, 1889. The injunction proceeding is in aid of the mandamus, as shown by the record, and, indeed, each refers to the other, and the nature of the remedy sought shows the ancillary character of the proceedings. Can it be contended that a court possessing enlarged jurisdiction, both at law and in equity, will decline to stay an illegal act, and preserve the statu quo until equal and exact justice can be

done? We think not, and therefore hold that upon the case presented the court had complete jurisdiction of the subject-matter and of the person, and properly granted the temporary injunction prayed for. That the command of the writ was disobeyed by the petitioners is not denied by them, and the record also shows the violation of the injunction by setting out in full the certificates which the court had restrained them from issuing. If the court had jurisdiction of the person and subject-matter—which we have already answered in the affirmative— it follows that the action of the petitioners in disobeying the order of the court was contempt, for which they were liable to punishment. They were properly brought before the court by attachment and punished by fine, and committed to the county jail until the fine and costs were paid.

It is objected by counsel for petitioners that the court exceeded its authority in the matter of punishment, inasmuch, as four different fines were assessed of $50 each for four distinct offenses in one proceeding. The record shows that these fines were assessed separately, and there being no doubt of the inherent power of the court to punish, as well as by virtue of the statute, there can be no doubt of the legality of the first fine of $50. But the fact that more fines were assessed would not make the entire punishment void. The petitioners are liable to be held for the valid fine. It is a mere irregularity, that does not warrant discharge on habeas corpus. Errors or irregularities are curable in the court from which the process issued, or by appeal; not on habeas corpus. Church Hab. Corp., sections 344, 363, and cases cited. The supreme court of the District of Columbia, in a case where three sentences had been imposed, says: "The relator appears to be

CONTEMPT: irregularity in assessment of fines.

imprisoned for three several terms of one hundred and eighty days each, without any specification as to the time of beginning or ending of the last two terms of imprisonment. The sentences pronounced by the court do not provide that the periods of imprisonment under these convictions are to commence at any future period, or after the expiration of the period mentioned in the former judgment. This omission is fatal to any imprisonment which exceeds that of a single sentence." There is nothing before this court to show that either of the petitioners moved the court to remit the fines, or that payment of either of the fines has been made; hence the punishment is not a matter for our consideration. The petitioners were committed to jail until the fine was paid, and properly so. The commitment is not a separate punishment; it is simply an incident to it. In the case of Fischer v. Hayes, 6 Fed. Rep. 63, the court said: "It is in this view that it has always been held that where the statute authorizes or prescribes the infliction of a fine as a punishment, either for a contempt of court or for a defined offense, it is lawful for the court inflicting the fine to direct that the parties stand committed until the fine be paid, although there be no specific affirmative grant of power in the statute to make such direction." It is not necessary in this case, nor does the court intend, to construe section 665, Compiled Laws, with a view of determining the power of the legislature to limit the courts in assessing a fine for contempt, nor whether the fine provided for would be the extent of punishment. The court observed the limit of the statute in assessing the fine for each contempt; and, while assessing fines in the same action for four distinct contempts may be irregular except as to the first, as the fines were separate it can not avail the petitioners prior to the payment of the valid fine and costs.

The objection of want of jurisdiction in vacation is not well taken. By section 1829, Compiled Laws, JURISDICTION in the courts of this territory are always open, vacation. and their jurisdiction is comprehensive enough to include proceedings in contempt. The prayer of the writ of habeas corpus will be denied, and the petitioners will be remanded to the custody of the officer.

FREEMAN and LEE, JJ., concur.

FREEMAN, J.—I concur in the conclusions reached in this cause by a majority of the court, and, in the main, with the reasons assigned. In view, however, of the importance attached to the questions involved, I have thought it not improper to place on file my own views.

This is an application on the part of the relators to be discharged from what they allege to be an unlawful restraint on their liberty. They incorporate as a part of their petition a part of the record of the proceedings in the district court, which culminated in the commitment from which they seek to be discharged. The other part of the record has been filed by the counsel for the territory. The record as thus made up exhibits, substantially, the following state of facts: The relators, who were on and preceding the fourth day of November, 1890, county commissioners for the county of Santa Fe, territory of New Mexico, were charged by law with the performance of certain duties. They are required to give notice of elections; to appoint for each precinct three persons of "discretion and good character" to act as judges; within six days after the election, public notice having been given, they are required to examine and count the votes polled for each candidate. I shall have occasion hereafter to note the extent of the power conferred by the term "examine and count the vote." They are also required

to supply each precinct with a ballot box, with lock and key; to forward within ten days to the secretary of the territory a "true extract of the votes polled." The failure through "culpable neglect" to have poll books forwarded to the election precincts, or a failure to count the votes at a proper time, subjects them to a fine of not more than $25, nor less than $10. If they shall give false or fraudulent certificates, or malicously throw out any returns sufficiently legal, "or shall substitute false returns for true ones, or prevent the popular vote being had. or shall be guilty of such frauds," they shall pay a fine of not exceeding $500, nor less than $200. They are to give to the person receiving the greatest number of votes a certificate of election. "Every commissioner who shall knowingly, ignorantly, or maliciously fail to comply with the duties imposed upon him by law and the provisions of this act, and who shall fail to count the votes at the time and place designated by law, or in any manner misrepresent the popular vote, or shall prevent or order the judges of election not to certify, or refuse to keep .open a poll book for the information of the public, at the courthouse, from the time the said poll book shall be delivereed to them until the day of examination of the same, and for the counting of the votes, or in any other manner shall prevent the obtaining of the legal vote of the people, or shall refuse to allow any candidate or citizen to examine the said poll book so placed for inspection, or shall give any false or fraudulent certificate, shall on conviction be fined in any sum not less than five hundred dollars, nor more than one thousand dollars, and shall be imprisoned in the county jail for not less than six months, nor more than one year, and, further, he shall be forever disqualified from holding any office of profit or honor in this territory." Compiled Laws, 1884, section 1205. It is also provided that the district judge may, on the presentation

of any one who may desire to do so, make a summary investigation of the charge of misconduct on the part of the commissioner, and, if he shall find him guilty, he shall suspend him from office until final decision at the next term of the district court. Section 1206, Compiled Laws.

Were it not for the disclosure made by the record in this cause, I should deem it unnecessary to say that the sole purpose of the legislature in the enactment of the statutes to which I have adverted was to secure a free, fair, and honest expression of the people at the polls. And aside from the discussion which has grown out of this case, and confining ourselves alone to the provisions of the law, it seems to me that the sole purpose of the legislature in providing for a board of canvassers was to secure that end. Whatever is honestly and intelligently done by a commissioner under the law to secure a free, fair, honest, and full expression of the popular will is done in the line of his duty. Whatever is done either "knowingly, ignorantly, or maliciously," to prevent that end, is a willful, ignorant, or malicious violation of the law, and merits the condemnation of all good citizens, and the punishment prescribed by law. The absolute necessity for the preservation of the freedom of elections and the purity of the ballot if so apparent as to admit of no discussion. It would be an idle waste of time to undertake to demonstrate that, in a government like ours, the line that marks the distinction between law and lawlessness, government and anarchy, is drawn at the ballot box; and he who undertakes to obstruct a free expression of public sentiment at the polls is an enemy to society and a public criminal. Nor does it palliate the offense that the obstruction is interposed under the color of authority. The desperate revolutionist who by force of arms undertakes to prevent the expression of popular will through the ballot box may be a bolder man

but he is none the more a criminal, than the man who under color of office seeks to do the same act. There is another point equally well settled, though possibly not so well understood, and that is that in the discharge of the duty imposed upon the commissioners to "examine and count the votes" they act in a purely ministerial capacity.

Whatever judicial function or discretion they may possess is exhausted in the selection of "discreet and honest judges of election." The vote having been cast, they have nothing to do but to examine and count it. When the examination reaches the point of disclosing the fact that the vote under consideration was actually cast, it must be counted. Mr. Associate Justice BRISTOL, in the case of Bull v. Southwick, 2 N. M. 353, said: "As such board of canvassers, they assumed judicial power to pass upon the illegality of, and reject, votes, without any other ceremony than because parties and bystanders challenge them as illegal. In this way hundreds of votes were thrown out, and the result of the election thereby arbitrarily changed. This is but another illustration of what experience has long since demonstrated, which is that if such judicial powers should be conferred upon mere canvassing boards, to be exercised at the close of a hotly contested election, in the absence of the real parties interested, and almost always with the partisan advisers of such boards in the background, their sittings would be marked by the exercise of arbitrary power that would be more aggressive and odious than that of the ancient court of Star Chamber." This case was heard and decided in 1882. It thus appears that, even prior to the passage of the act of the legislature to which I am about to refer, the doctrine that the county commissioners sitting as a board of canvassers were mere ministerial officers, clothed with no judicial discretion, was firmly settled by judicial construction in this ter-

ritory. In order, however, to remove any doubt that might exist, and to put at rest any and all vexatious questions that might arise before such boards of canvassers, the legislature, at its twenty-eighth session, passed an act, the thirteenth section of which is as follows: "Sec. 13. That the board of county commissioners, sitting as a canvassing board for the purpose of canvassing the returns of any election hereafter held in this territory, shall not adjourn or become functus officio as a canvassing board until such board of commissioners shall have canvassed each and every return of election before them, and shall have declared the result from the face of such returns; and if any board of county commissioners, sitting as a canvassing board, shall fail, neglect, or refuse to canvass any return of any election before said board under any pretense that such return is irregular, or for any other pretense, it shall be lawful for any qualified voter to present his petition under oath to the judge of the district court having jurisdiction, at his chambers, briefly setting forth the facts and circumstances, and praying that such board of commissioners shall be required by a writ of mandamus, issuing out of such court, to count and certify such returns; and therefore it shall be the duty of the district judge to immediately issue, or cause to be issued, his alternative writ of mandamus, requiring such commissioners either to canvass such return, or returns, and to declare the result, or to appear in person forthwith before such court, and bring with them all of such returns; and, if such commissioners shall decline to canvass such return, or returns, they shall appear before said court in obedience to such writ, and take with them all of the returns, or papers purporting to be returns, before them; and thereupon the court shall forthwith proceed to examine said returns, and upon such examination may issue his peremptory writ commanding said board of commissioners to

immediately canvass any or all of such returns, and to
declare the result.'' Sess. Laws, 1889, p. 321. This
law went into effect February 28, 1889. The section of
the statute which I have quoted· seems to me to be too
plain to admit of construction. Let us analyze it, for
a moment, in order to see if it contains any provision
that can, by any possibility, be misunderstood. First.
The board shall not adjourn until it has canvassed each
and every return before it, and shall have declared the
result. Second. If it shall fail, neglect, or refuse to
canvass any return under any pretense that such return
is irregular, or for any other pretense, any qualified
voter may present his petition to the district judge,
praying that such board may be required by writ of
mandamus to count and certify such returns. What
returns? Why, the returns that said board, under
some pretense, have failed or refused to canvass.
Third. The district judge is then required immediately
to issue his alternative writ, requiring the board to
either canvass such returns and declare the result, or
to appear before him in person forthwith, and bring
with them all such returns. The judge is to issue his
mandamus immediately, and the commissioners are to
appear forthwith. No provision is made for waiting
for the regular term of the court. Fourth. If the com-
missioners decline to canvass such returns, they shall,
in obedience to the writ, i. e., forthwith, appear before
the judge, and bring with them—what? Bring with
them what they, in their judgment, regard as the
proper, legal, and regular returns? No. This is not
what they are to be ordered to do, but to bring with
them all the returns, ''or papers purporting to be re-
turns.'' Fifth. Having done this—having, in obedience
to the writ, appeared in person before the judge, and
having produced, not only all the returns, but each and
every paper purporting to be a return,—their power, au-
thority, and responsibility practically cease. For, sixth,

immediately on the production of such papers, the judge himself shall proceed to examine them; and his judgment, so far as the commissioners are concerned, is absolutely conclusive. For, seventh, the judge is required, as a result of his examination, to issue a peremptory writ commanding said board to canvass any or all of such returns, and declare the result. That is to say, the judge is required to examine all of the papers and to declare what are and what are not proper returns, and to direct the board to declare the result.

The express provision of this statute makes the judge quo ad hoc a revisory canvassing board, and nothing is left for the commissioners except to obey his mandate. Hence I repeat that whatever discretion, ministerial, judicial, or otherwise, vested in the commissioners as a board of canvassers ceases the moment they appear before the judge in response to the alternative writ. They are not merely his subordinates. They no longer constitute any part of the board, so far as relates to any question growing out of the validity or invalidity of the papers filed with them as returns, or as papers purporting to be returns. Any effort on their part thereafter to impress their views upon the result is not merely contempt of court, but a plain and culpable usurpation of authority. It is no answer to say that a mandate of a judge directing the board to canvass certain returns, thereby declaring the election of a particular candidate, is an unwarranted invasion of the legislative by the judicial branch of the government. This is not true in fact, and for three reasons. In the first place, the legislature is the sole judge of the election, qualification, and return of its own members. It may seat a member with or without a certificate of election. If it should appear to that body that a member having a certificate issued to him by the board of canvassers, as a result either of their own examination or that of the judge, was not in fact

elected, it would be its duty to deny him the privileges of a member. In the second place, the relation of county commissioners is as foreign to the legislature as that of the judge. The district judge belongs to the judiciary, and the county commissioners to the executive, or administrative, branch of the government. Each, to a certain extent, is independent of the other, and the legislative branch is absolutely independent of both. In the third place, the legislative branch of the government, being independent of both the judiciary and administrative branches, has a perfect right to vest the power of canvassing the returns of an election in any officer it may choose, either executive or judicial, or to create an office especially clothed with that power. As we have seen, it has clothed certain administrative officers, to wit, county commissioners, with this power to be exercised in the first instance, and, following the usual line of remedial jurisdiction in other matters, it has vested in the judiciary a supervising or controlling power. Such being the law as I understand it, I shall endeavor to apply it to the facts in this case.

On the twelfth day of November, 1890, there was issued out of the district court, of the county of Santa Fe, a writ of mandamus, directed to the county commissioners, the relators in this case. This alternative writ, after reciting that it was issued on the petition of Benjamin M. Read, "a resident and qualified voter of said county," proceeds to set out the charges, which are substantially as follows: That the board of commissioners had failed, neglected, and refused to canvass the returns from precincts numbered 1, 2, 16, and 8, and also that they had refused to canvass four votes cast for petitioner at precinct number 11. The writ concluded as follows: "Now, therefore, you are hereby required either to canvass such returns, including said certificate from precinct number 8, of said county, and also to canvass and count the said four votes polled

in precinct number 11 of said county, which are marked 'Not registered' upon the poll books of said precinct, and declare the result, or to appear in person forthwith before said district court, and bring with you all of said returns, and all of the returns, or papers purporting to be returns, before you." On the thirteenth day of the same month the respondents appeared and filed their answer, which, after setting out in detail the alleged irregularities which, in the opinion of the board, required them to reject and to refuse to canvass certain returns therein described, concludes as follows: "Your respondents, therefore, in obedience to the requirements of said alternative writ of mandamus, appear before your honor in person, as well as by their attorneys, N. B. Laughlin and Francis Downs, Esquires, and they present before your honor all such returns, or papers purporting to be returns, before you." It is not pretended that the proceedings thus far were not in strict accord with the act of the legislature already quoted. On the issue thus joined, the cause was heard by the district judge, and a peremptory writ of mandamus awarded. To this ruling of the court respondents tendered a bill of exceptions, which was duly signed and sealed. On the same day that the alternative writ of mandamus was issued a petition was filed on the equity side of said court, by the said Benjamin M. Read, and by Joseph B. Mayo, and Thomas B. Catron, against the said commissioners, averring, substantially, that complainants were, at the election held on the fourth of said month, candidates for seats in the legislative assembly of said territory; that defendants constituted the board of canvassers, whose duty it was to canvass the votes polled at said election, in said county of Santa Fe; that said commissioners had assembled at the courthouse in said county, "but have failed, neglected, and refused to count a portion of the votes polled at said election for these complainants,"

etc.; that said refusal would materially affect the result of said election, and would make it appear that persons other than complainants had been elected; that said commissioners were threatening to give certificates of election to other parties, etc. They asked that an injunction issue, restraining the commissioners from issuing certificates of election to others than complainants. An injunction was issued in accordance with the prayer of the bill. On the fifth of December, 1890, defendants answered. They admit that complainants were candidates at said election, but deny that they received a majority of the votes cast. They then set out what they deemed various irregularities in the returns of precincts 1, 2, 8, 11, and 16; that these returns were not in regular and perfect condition, etc.; that they met, and proceeded to canvass the returns; that, while so doing, "the complainants, well knowing the irregularities, fraud, and deceit appearing in some precincts, and the illegal and insufficient manner and condition of the pretended and alleged returns before said defendants as such canvassing board, and that the said pretended and alleged returns were so irregular and insufficient that the said board could not receive and count them, they (the complainants), in anticipation of their decision as such board of canvassers, filed a bill in chancery, and obtained an injunction, issued out of this honorable court, by which they were restrained and enjoined from making and completing the count and canvass of all the votes cast in said election, according to the returns made to them as such board. And these defendants deny that the pretended returns made to them as a canvassing board of precincts in said county numbered 1, 2, 8, 11, and 16, were in regular and perfect condition, but they aver and state to the court here that the alleged returns before them from precincts 1, 2, and 16 were irregular, and contrary to law, and the statutes in such case made and

provided; and that the face of the returns from precinct 11 was regular, and was so counted, when reached by the board in the regular order. But there was never at any time any poll book, ballot box, or returns of any kind before these defendants, as a canvassing board or otherwise, from said precinct numbered 8 in said county; that there was not at any time evidence before them that an election had been held at precinct number eight on the 4th day of November, 1890," etc. They deny that they had failed to count any votes "properly returned;" deny that they threaten to give certificates to persons "who did not receive the greatest number of votes," etc. They admit that "a certain paper purporting to be a certificate of election returns signed by four persons, two of whom signed as judges of election, and two as secretaries or clerks of election, in precinct numbered 8 in said county, was presented to the defendants while sitting as a board of canvassers by one of the complainants, Benjamin M. Read, who was a candidate as aforesaid, and an interested party in the result of the canvass and count, and who was not authorized by law to act as messenger or custodian of the election returns; and they aver that the said purported certificate or paper is irregular in form, insufficient in law, does not contain a true and correct statement of the votes cast and polled at said precinct No. 8 on the 4th day of November, 1890, and that said alleged certificate, if canvassed and counted, would change the elections returns, and would have the effect of giving majorities to persons who were not elected by a majority of the votes cast at said election; that said alleged certificate gives majorities from four to eleven greater than the actual vote as it was cast, polled, and counted, and certified by the judges of election, as these defendants are informed and believe." They then allege on information and belief that said certificate was made at Santa Fe, and

under the supervision of interested parties, etc., and by parties who never saw the original certificate made out and signed by the judges of election, if any such original certificate was ever so made out and signed. "That one of the persons who signed said paper as an election judge did so at the request of some person who came from Santa Fe, with the paper already filled out to be signed, and seven days after his official position as judge of election had expired." The contradictory statements contained in this answer, of themselves convict the board of an attempt to suppress the popular vote and defeat the will of the people; for while, in one part of the answer, they charge that there was not at any time evidence before them of any election at precinct number 8, they nevertheless admit in another portion of the answer that a paper purporting to be a return from said precinct, signed by two judges of election and two clerks, had been filed with them; but they allege that said "purported certificate" did not contain a true and correct statement of the votes polled at said precinct. How did they know that "purported certificate" did not contain a true statement of the votes polled, if they had never had before them any evidence that any such election had been had? Having answered, they demurred to the bill, setting out six causes of demurrer, substantially as follows: First, the court has no jurisdiction of the parties; second, because the court has no jurisdiction of the subject-matter in controversy; third, because the court has no jurisdiction of the subject-matters and the persons; fourth, the bill does not state facts sufficient upon which to base an action; fifth, complainants have no common interest; sixth, that the bill is multifarious. This answer, in the nature of a demurrer, was filed on December 5, and on the same day a motion was filed to dissolve the injunction. On the seventeenth day of January, 1891, one of the complainants filed in the

cause an affidavit reciting that defendants, in violation of the injunction, had on the fifth day of December, 1890, issued certificates, etc.; and thereupon a writ of attachment was issued. The parties were arrested, and on January 19 appeared and filed a motion to quash the attachment. The grounds of this motion were substantially as follows: First, the judge had no power in vacation to issue the attachment; second, because the judge had no power, jurisdiction, nor authority to institute proceedings for contempt; third, the judge had no power to issue an injunction to prevent the board of canvassers from issuing certificates; fourth, the judge had no power to issue an injunction, which was therefore void; fifth, because no order to show cause had preceded the writ of attachment; sixth, because the rules and regulations of the chancery court were not observed in the issuance of the writ of attachment. On the twentieth of January, an order was entered by the district judge reciting that upon a hearing of the parties, and upon the full consideration of the cause, he had found the parties guilty of four several acts of contempt, and imposing a fine of $50 upon them for each of the alleged acts of contempt. They were adjudged guilty of contempt, and an order of commitment was entered against them in the event that the fines were not promptly paid.

That we may have a proper conception of the relation sustained to each other by the two proceedings of mandamus and injunction, it may not be improper to note the order in which the several steps were taken. Both writs were applied for and issued on the same day, to wit, November 12, 1890. On the thirteenth of the same month defendants answered the alternative writ of mandamus, and on the eighteenth a preemptory writ was issued. On the fifth of December defendants filed their answer to the bill for injunction, and also moved to dissolve the same, and on the same day they

proceeded, in direct violation of its terms, to issue certificates of election.

I shall not consume time in discussing the question as to the jurisdiction of the court to issue the writ of mandamus. The act of February 28, 1889, confers the power in express terms. Not only so, but the facts in this case, in their minutest detail, bring it within the express terms of the statute. Every requirement of the statute, save one, was met. The complaint was made; the alternative writ was issued; the respondents appeared and produced the returns; the judge examined them; the peremptory writ was issued. At this point, however, obedience to law was abandoned. The respondents, the relators here, thinking, no doubt honestly, that they were better qualified to take care of the public interests than the legislature, determined to defy the law. It is trifling with the occasion to treat the conduct of these relators as a contempt of court. It was a contempt of law. It would be an unwarrantable reflection upon their intelligence to say that they did not understand their duty in the premises. It was not a matter of mistake. It would be a reflection on the voters of the county to suggest that three men too ignorant to understand the thirteenth section of the act of February 28, 1889, could be elected to the office of county commissioner. But, conceding the jurisdiction to issue the mandamus, it is insisted that the court had no authority to issue the injunction; that the act of 1889, imposing on the judge the duty of issuing the mandamus, is an implied denial of his authority to proceed by any other method; and the familiar doctrine that expressio unius est exclusio alterius is invoked to sustain this view. Opposed to this, however, is the equally familiar doctrine that, when power is conferred on a court to do any particular thing, there is, in the absence of express provision to the contrary, an implied grant of power to issue such process as may

be necessary to carry into execution the power conferred. This is especially true of courts of common law and chancery jurisdiction; and section 1868 of the organic act provides that "the supreme court and district courts, respectively, of every territory, shall possess chancery, as well as common law, jurisdiction."

But there is another reason that, to my mind, is conclusive of this question. It is well settled that the two processes, mandamus and injunction, are correlative in their character and operation. As a rule, whenever a court will interpose by mandamus to compel the performance of a duty, it will exercise its restraining power to prevent a corresponding violation of duty. The supreme court of the United States has declared: "But it has been well settled that when a plain, official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who has sustained personal injury by such refusal may have a mandamus to compel its performance; and, when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which an adequate compensation can not be had at law, may have an injunction to prevent it. In such cases the writs of mandamus and injunction are somewhat correlative to each other." Board of Liquidation et al v. McComb, 92 U. S. 541; High Extr. Rem., sec. 6. Even under the common law as it existed in England at a time when the writ of mandamus issued only as a prerogative writ, and before it became what it now is,—a writ of right, issuing ex debito justitiae,—it exercised a restraining, as well as a coercive, power. 5 Pet. 192. The injunction was purely ancillary to the mandamus. The relation which the former writ sustained to the latter was precisely that of an attachment sued out in aid of a common law action of debt. The purpose, and only purpose, was to preserve the statu quo pending the

determination of the question raised by the proceeding by mandamus. There was, in fact, but one cause of action, and, in law, practically but one suit. If the petitioners were not entitled to an injunction, they were unquestionably not entitled to mandamus. The purpose of the mandamus was to compel the commissioners to do that which could be done only as a prerequisite to the issuance of a certificate of election. Under the law, they were first to canvass the vote and declare the result, and afterward to issue a certificate of election. To say that, while they might be compelled by mandamus to canvass the return, they could not be restrained from issuing a certificate, predicated upon a result reached in defiance of the mandamus, is to announce a solecism. In the view that I have taken of the matter, the proceeding by injunction was unnecessary. Pending the proceeding by mandamus, the board had no authority to issue a certificate of election. A peremptory writ of mandamus commanding the commissioners to canvass the votes cast at an election is, ex vi termini, a command to them to do nothing that will defeat the purposes of the writ. It was the duty of the board to obey the writ, not alone in its substance, but in its spirit. High Extr. Rem., sec. 566. Hence it follows that the issuance of the certificate pending the operation of the writ of mandamus was a violation of its terms, and warranted the imposition of a fine for contempt. Granting, however, that an injunction was unnecessary, it does not rest with the relators in this proceeding to say that the court was unnecessarily specific in its directions to them. If, in good faith, they had obeyed the mandamus, I am inclined to the opinion that they would have been entitled to their costs as to the injunction; but the effort to escape the penalty incurred by gross and willful violation of law, by showing that the proceedings of the court were irregular, or that its processes were unneces-

sarily specific, does not commend itself to the favorable consideration of the court.

It is further insisted, however, that the whole proceeding before the district judge was void for the reasons—First, that the rival candidates for the legislature should have been remitted to their right of contest; and, second, because the interposition of the court was unwarranted interference on the part of the judicial with the legislative branch of the government. This proposition has been urged with commendable zeal, and with great ability. The learned counsel for the relators have exhibited great research in the production of authorities to sustain their views. They have insisted that, if the courts can interpose by mandamus or injunction to control elections, they may curtail, if not destroy, the powers vested in the other branches of the government; and numerous authorities have been cited to sustain this view. The case of relators does not raise this question. So far from being enjoined against the discharge of their duty, they were required by the mandamus to perform their duty. So far from the action of the judge being an infringement on the prerogatives of the legislature, he was himself acting under the mandate of an act of the legislature. I should not deem it necessary or proper, in view of the act of the legislature I have already quoted, to discuss the question as to the authority of the court to interpose its mandamus, but for the earnestness with which the counsel for the relators have insisted that the action of the judge was a usurpation, and, therefore, void. I shall briefly review some of the authorities cited as sustaining the position of relators' counsel.

In the case of Western Railroad Co. v. De Graff, 27 Minn. 1, it was sought to enjoin the governor of the state from the performance of certain duties imposed upon him by the legislature. It was held that this could not be done. It is true that the judge, in

rendering the opinion of the court, states very broadly that under the constitution of that state the courts are powerless to interfere with the operations of any officer of the executive department, whether the action sought to be controlled was ministerial merely, or one involving the exercise of "discretion and judgment alone." Whether the general principle stated be correct or otherwise, the facts in the case warranted the conclusion reached.   No such authority was sought to be exercised in the case at bar.   In the case of Walton v. Develing, 61 Ill. 201, the syllabus is as follows: "Where the law authorizes an election to be called in a township, to determine whether a majority are in favor of subscribing to the stock of a railroad company, when the election is called in pursuance of the requirements of the law, a court of equity has no power to restrain the officers from holding, or the people from voting at, such election.  A writ of injunction issued in such case is void, and the officers and people are not bound to obey it, as the court has no jurisdiction."   In the case of Harris v. Schryock, 82 Ill. 119, it was said: "But, according to repeated decisions of this court, the power to hold an election is political, and not judicial; hence a court of equity has no power to restrain officers from the exercise of such powers."   In the same state, in the case of Dickey v. Reed, 78 Ill. 271, the court repeats the same doctrine, declaring that "elections belong to the political branch of the government, and are beyond the control of the judicial power.   *   *   *   And the political power of the state may organize municipal bodies, and put them into operation, by force of enactment, or by election of the people to be thus governed, and they can provide the modes of reviewing the returns of election to ascertain whether they are in accordance with the expressed will of the people, and, until the courts are empowered by the constitution or

legislative enactment, they must refrain from interference.''

I have thus referred to what seemed to the counsel for relators as the most direct authorities in support of their position for the purpose of showing that they are not either directly or by implication assailed by the views that I have advanced. In the case at bar, the election had been held, the vote had been cast, and the alleged interference on the part of the judge was in the exercise of a duty imposed on him by the very authority that created the board of commissioners. In the language of the decision last quoted, he was empowered to act by ''legislative enactment.'' It was not, therefore, a case of interference on the part of the judiciary with the right of election, but of open and avowed revolt on the part of the commissioners against the organized government of the territory. The true doctrine, under our form of government, is this: Every qualified voter has the right to cast his vote and have it counted. When the legislative power has appointed an election, and provided the proper officers for holding it and declaring the result, the courts have no power to interpose by way of preventing the exercise of such function. But no such officer has authority, under color of his office, to defeat the will of the people as expressed at the polls, and, if he undertakes to do so, it is the duty of the courts, on proper application, and within the rules prescribed by the legislature, to interfere by such remedial process as may be necessary to attain the proper remedy. In respect of their purely ministerial duties, election officers are not beyond the control of the courts. Cooley Const. Lim. 621; High Extr. Rem., sec. 56.

A question was raised in the argument as to the right of the judge to enter the judgment complained of at chambers. The authority to do so is conferred in such specific terms by section 1829 of the Compiled

Laws that the mere reference to that section is regarded
as sufficient answer to this objection. It was also
insisted on the argument that under the provisions of
section 665 of the Compiled Laws the judge had no
authority to impose a fine in excess of $50 without a
trial by jury. The several acts and omissions on the
part of the relators constituted, in my opinion, but
one offense. I think the mode adopted in fixing the
amount of the fine was irregular, but it is an irregular-
ity that can not be taken advantage of in this proceed-
ing. But I do not agree with the learned counsel for
the relators that the section referred to was intended
to operate as a limitation upon the right of a judge to
impose a fine for a contempt of court committed in a
refusal to obey one of its mandates. On the contrary,
I am satisfied that this statute relates alone to the
preservation of order and decorum in the presence of
the court.

I must say that, in the view I take of this cause,
the discussion has taken a much wider range than was
pertinent to what I conceive to be the only issue in-
volved. Section 13 of the act of February 28, 1889,
unquestionably gives the district judge jurisdiction of
the controversy out of which the proceedings for con-
tempt arose. Section 2027 of the Compiled Laws of
1884 requires this court to forthwith remand the rela-
tors, if it should appear that they are detained in
custody for any contempt, specially and plainly
charged in the commitment, by some court, officer, or
body having the authority to commit for the con-
tempt so charged. All of this appears on the face of
the petition, and I think, therefore, that the motion to
dismiss the writ, and remand the relators, is well
taken, and should be allowed.

O'BRIEN, C. J. (dissenting).—To my mind, it is
clear that two errors, at least, fatal to the validity of

the . commitment of the relators, appear upon the record of these proceedings. First, that the court had no jurisdiction, in the first instance, to issue the writ of injunction; second, that the judgment upon the hearing, touching the violation of the injunctional order, imposing a fine of $200 on each of the relators, and ordering their imprisonment until such fine be paid, is illegal and of no binding validity. For the purpose of a proper understanding of the case, the bill of complaint, the writ of injunction, judgment on attachment, and commitment are set out in extenso:

"In the district court of Santa Fe county. Bill for injunction. Territory of New Mexico, county of Santa Fe—ss.: In the district court for the said county of Santa Fe, sitting for the trial of causes arising under the laws of said territory.

"To the Honorable Edward P. Seeds, associate justice of the supreme court of said territory, and judge of the said district court:

"Benjamin M. Read, Joseph B. Mayo, and Thomas B. Catron, residents of said county, bring this, their bill of complaint against John H. Sloan, George L. Wyllys, and Teodoro Martinez, also residents of said county, and show unto your honor: Complainants were candidates at the election held in said county on the fourth day of November, 1890, said Read and Mayo for the offices of members of the house of representatives of the legislative assembly of New Mexico, and said Catron for the office of member of the council of said legislative assembly, and, as such candidates, were voted for by voters of said county, and, as shown by the election returns, received majorities of the votes cast for said offices, respectively. Defendants are the county commissioners of said county, and, as such, are required by law, within six days after an election, to publicly examine and count the votes polled for each candidate, and to forward to the persons who

have received the greatest number of votes polled at any election held for members of the house of representatives, the corresponding certificate of election. That defendants have assembled in the courthouse in the county of Santa Fe for the purpose aforesaid, but have failed, neglected, and refused to count a portion of the votes polled at said election for these complainants, such portion being the votes cast for complainants in the precincts of said county numbered 1, 2, 8, 11, and 16; the returns of election from said precincts being before said defendants, and in regular and perfect condition. The failure and refusal of defendants to count said votes as shown by said returns will materially affect the result of said count so as to make it appear that persons other than complainants have been elected to said offices, although such is not really the fact; and defendants give out and threaten that they will make and deliver, or cause to be made and delivered, to such other persons, certificates showing their election to the offices aforesaid, and complainants believe that they will certainly do so, unless restrained by an order of the court. If such certificates are so made and issued to such other persons, great and irreparable damage may and probably will result to complainants, and each of them, and to the public generally; and the existence of such certificates may and probably will be the cause of numerous suits, and vexatious and expensive litigation, as has heretofore been the case in this territory under similar circumstances. As soon as the said count by the said defendants is completed, complainants will institute, or cause to be instituted, in accordance with the statute, proceedings in mandamus to compel defendants to canvass all of the returns of said election in said county; but before such proceedings can be made effective, and before a complete canvass can be made, defendants will issue, or cause to be issued, such im-

proper and fraudulent certificates of election as here-inbefore described.    Complainants therefore pray that defendants be restrained and enjoined by an injunc-tion of this court from making and delivering, or ordering or causing to be made or delivered, any cer-tificate of election to either of the offices hereinbefore mentioned to any person or persons other than these complainants, and from making, or causing to be made, any record of the result of their canvass of said election returns until the further order of the court in the premises.    May it please your honor to grant unto complainants the writ of subpoena, under the seal of this honorable court, directed to defendants, John H. Sloan, George L. Wyllys, and Teodoro Martinez, com-manding them, and each of them, to appear before this court on a day and under a penalty to be therein fixed, then and there to answer unto the premises· as fully as if the same were here repeated, and they par-ticularly interrogated thereunto, but not under oath, an answer under oath being hereby expressly waived, and to abide the order or decree of the court in the premises.

"BENJAMIN M. READ."

·"Territory of New Mexico, county of Santa Fe.

"On this 12th day of November, 1890, personally appeared before me Benjamin M. Read, and made oath that he had read the foregoing bill by him subscribed, and knew the contents thereof, and that the same is true, except as to the matters therein alleged upon information and belief, and as to those matters he believes it to be true.    Witness my hand, and the seal of the district court of the first judicial district of the territory of New Mexico, the day and year last above written.

"A. E. WALKER,    [SEAL]
"Clerk of the District Court."

"Territory of New Mexico to John H. Sloan, George
L. Wyllys, and Teodoro Martinez, greeting:

"Whereas, Benjamin M. Read, Joseph B. Mayo,
and Thomas B. Catron have filed in the district court
for Santa Fe county their bill of complaint against you,
praying to be relieved touching the matters therein set
forth, now, therefore, you, the said John H. Sloan,
George L. Wyllys, and Teodoro Martinez, both indi-
vidually and as members of the board of county com-
missioners of Santa Fe county, your agents, servants,
employees, and advisers, are hereby restrained and
enjoined from making and delivering, or ordering or
causing to be made or delivered, any certificate of elec-
tion to the offices of members of the house of repre-
sentatives of the legislative assembly of the territory of
New Mexico, and of member of the council of said leg-
islative assembly, to any person or persons, other than
said Benjamin M. Read, Joseph B. Mayo, and Thomas
B. Catron, and from making, or causing to be made,
any record of the result of your canvass of the election
returns of the election held in said county of Santa Fe
on the 4th day of November, 1890, until the further
order of the said district court in the premises.    Wit-
ness the Honorable Edward P. Seeds, associate justice
of the supreme court of the territory of New Mexico,
and judge of the First judicial district court thereof,
and the seal of said district court, this 12th day of
November, 1890.

                  "A. E. WALKER, Clerk.    [SEAL]"

"The territory of New Mexico to the sheriff of Santa
Fe county, greeting:

"You are hereby commanded to arrest and take
the body of John H. Sloan, and him safely keep, so
that you have his body before the district court within
and for the county of Santa Fe, sitting at chambers at
the federal building in said county, on Monday, Jan-
uary 19, 1891, at nine o'clock, A. M., then and there to

answer for a charge of contempt. Witness the Honorable Edward P. Seeds, associate justice of the supreme court of the territory of New Mexico, and judge of the First judicial district court thereof, and the seal of said district court, this 17th day of January, 1891.

"A. E. WALKER, Clerk. [SEAL]

The attachment of Teodoro Martinez is in the same words.

"The territory of New Mexico to Francisco Chavez, sheriff of the county of Santa Fe, greeting:

"Whereas, on the 12th day of November, 1890, an injunction was issued out of the district court of Santa Fe county enjoining and restraining John H. Sloan, George L. Wyllys, and Teodoro Martinez, both individually and as members of the board of county commissioners of said Santa Fe county, their agents, servants, employees, and advisers, from making or delivering, or ordering or causing to be made or delivered, any certificate of election to the offices of members of the house of representatives of the legislative assembly of the territory of New Mexico, and of member of the council of said legislative assembly, to any person or persons other than Benjamin M. Read, Joseph B. Mayo, and Thomas B. Catron, and from making, or causing to be made, any record of the result of their canvass of the election returns of the election held in said county of Santa Fe on the 4th day of November, 1890, until the further order of said district court in the premises. And whereas, on the 17th day of January, 1891, there was filed in the office of the clerk of said court the petition of the said Thomas B. Catron, setting forth that the said John H. Sloan and Teodoro Martinez, two of the defendants in said injunction proceeding, wholly disregarding the injunction so issued as aforesaid, did, on the 5th day of December, 1890, sitting as a board of canvassers of said county, canvass the returns of the general election held in said county on

the 4th day of November, 1890, and did on said 5th day of December, 1890, make, order, and deliver a certificate of election to the offices of members of the house of representatives of the legislative assembly to persons other than the said Benjamin M. Read, the said Joseph B. Mayo, and the said Thomas B. Catron, to wit, to one Charles F. Easley, to one Thomas P. Gable, and to one Romulo Martinez; the said Easley and the said Gable receiving certificates of election to the office of member of the house of representatives of the legislative assembly, and the said Romulo Martinez receiving a certificate to the office of member of the council of said legislative assembly; and praying that that court cause attachments to issue for the arrest of the said John H. Sloan and Teodoro Martinez for contempt. Whereupon such proceedings were had by the said court that on January 20, 1891, after attachments had been issued by said court against the said John H. Sloan and Teodoro Martinez, and after the bodies of the said Sloan and the said Martinez had been presented before the said court by you, the said sheriff, they being accompanied by counsel, and after a full hearing of counsel, the said John H. Sloan and Teodoro Martinez were adjudged guilty of contempt of this court in issuing and delivering a certificate of election to Charles F. Easley, in issuing and deliving a certificate of election to Romulo Martinez, and in making, or causing to be made, a record of the result of their canvass of the returns of the election held in said county of Santa Fe on the 4th day of November, 1890, and the punishment of each of said defendants was assessed to a fine of fifty dollars for each of the said several contempts, making a total of two hundred dollars against each of said defendants: Now, therefore, you, the said sheriff of Santa Fe county, are hereby commanded that of the lands and tenements, goods and chattels, of John H. Sloan, in your

county, you cause to be made the sum of two hundred dollars fine, and seventeen dollars and forty-five cents costs of suit, which, by the said judgment of the said district court on the 20th day of January, 1891, the territory recovered against the said John H. Sloan, and in default of the prompt payment of the said sum by the said John H. Sloan that you confine the body of the said John H. Sloan in the common jail of said county until said fine and costs are fully paid and satisfied, and due return made of this writ, with your proceedings thereon.    Witness the Honorable Edward P. Seeds, associate justice of the supreme court of the territory of New Mexico, and judge of the first judicial district court thereof, and the seal of said district court, this 20th day of January, 1891.

"A. E. WALKER, Clerk.    [SEAL]"

It appears, then, that the writ was granted at the suit of T. B. Catron, who claimed to be elected member of the council, and Benjamin M. Read and J. B. Mayo, who claimed to be elected members of the house, in the present general assembly of this territory.    They filed their bill before the completion of the official canvass of the votes by the board of county commissioners. Irregularities in returns from some of the precincts may have occurred, or the petitioners may have had reasons to suspect that the board of county commissioners would not make a full and impartial canvass of the votes returned.    It may not be amiss to remark, in passing, that the three petitioners, Catron, Read, and Mayo, are, or claim to be, republicans, and that two of the three county commissioners are democrats. Partisan zeal may be at the bottom of the trouble. The important question to determine is, had petitioners a right to invoke the aid of a court of chancery to protect them by writ of injunction against the consequences of the possible, probable, or actual dishonesty of the county commissioners in making the official

canvass and issuing certificates of election? Plainly,
no such right existed if the law intrusted to another
tribunal power to apply the proper remedy and offered
complete relief.  Each house of the legislative assembly
is the exclusive judge of the election and qualification
of its members.  No decree, interlocutory or final, of a
court of chancery can affect or impair this power.  The
judgment or discretion of the legislature can not be
controlled by such decree.  Its action in the premises
is independent, final, and unassailable.  Before it all
contests must be decided.  We cite the appropriate
sections of the Compiled Laws of 1884, as amended by
Laws of 1889: "Sec. 1172 (as amended Session
Laws, 1889, p. 318).  If any candidate from any county
or district in this territory contest the seat of any repre-
sentative or member of the council, said person shall
give written notice to the contestee within thirty days
after the returns of the election are received by the
secretary of the territory.  Said notice of contest shall
specify as nearly as may be the grounds upon which
the contestant relies, and it shall also give the name of
some justice of the peace or notary public before whom
it is proposed to take proofs in support of the grounds
alleged and set forth in such notice, and also the time
and place of the taking thereof.  Sec. 1173 (as amended
Session Laws, 1889, p. 318).  The contestees, at the
time and place of taking such proofs, may select
another justice of the peace or notary public to assist
in taking of such proof as he desires; but a failure to
do so shall not affect the right of contestant to proceed
with his testimony under his notice.  Sec. 1174.  To
reject any illegal votes that may be polled at any elec-
tion in this territory, it shall not be necessary to con-
test or question them at the polls, but they may be
rejected by the authorities authorized by law to deter-
mine the validity of said elections, on being proved,
after due notice is given by the party contesting said

election to the opposing party. Said notice in any county election shall not be less than eight days, and shall in all cases be within thirty days thereafter. Sec. 1175. If the person whose seat is contested in either branch of the assembly intends to question the illegality of any votes given to the contesting candidates, he shall, within eight days after said contest, give equal notice to the opposite party in the manner prescribed in section 1172. Secs. 1176, 1177, 1178 (as amended Session Laws, 1889, p. 318). If the justice or justices of the peace, notary or notaries, appointed, or any of them, should fail, on account of sickness or other just cause, to be present at the taking of the testimony in such contests, another justice of the peace or justices, notary or notaries, may be chosen by the contestant parties, and the taking of such testimony shall commence within thirty days after the election, and the said justice or justices of the peace, or notary or notaries, shall issue subpoena (s) to all persons required by either party to appear and testify. Said justice or justices of the peace, notary or notaries, shall hear all the testimony, and certify the same to the president of the council, if the seat contested shall be that of a councilman, and to the speaker of the house of representatives, if it be that of a representative, on or before the first day of the session of the legislative assembly. Sec. 1179. No testimony shall be received by the justices, or either branch of the territorial legislature, from either the contesting or opposing parties, unless it refers to the points specified in the notice. The justices of the peace shall forward to the general assembly a certificate, together with the depositions taken by them, and no others, and the legislative assembly shall not receive any other testimony than that already specified."

The foregoing sections are unmistakably intended to furnish legislative candidates with adequate means to protect their rights and prevent injustice.

The forum therein recognized as adequate to grant complete relief, to detect mistakes and frauds in all stages of the election, from the opening of the polls to the issuing of the certificates, is either house of the general assembly. Why should a court of chancery assume jurisdiction in a proceeding wherein it would be powerless to enforce obedience to its decrees? It has no right to decide who is or who is not elected. The legislature alone has the exclusive power to determine that fact. But, it may be said, it may regulate the intermediate procedure. Why should it? Does not the written law amply provide for the redress of any wrong that may be committed in the course of such procedure? Who has constituted the chancellor's court a more reliable or less partisan tribunal than the council or the house of the general assembly for the rectification and settlement of the frauds or errors incident to popular elections? Once concede to the courts the right to interfere in such proceedings, and who can define the limits of such assumption? In the present case, each of the three petitioners received a certificate of election in accordance with the will of the chancellor, as expressed in the preliminary writ of injunction; but the two members of the house, upon contest had before that body, within a few days after their admission, were expelled, and their seats awarded to other parties. If wrong, can any order or decree entered or to be entered by the chancellor afford a remedy? Will courts take jurisdiction of causes wherein they are powerless to enforce their judgments? It may be said, in answer to this, that the present suit by injunction was simultaneous with and ancillary to mandamus proceedings instituted to compel the county commissioners to receive and canvass the election returns. How does that relieve the matter of its objectionable features, as long as each house of the general assembly has legal power to ignore the adjudications in either

case, and to approve or disapprove the alleged misconduct of the commissioners, by awarding seats to the candidates who, in its opinion, were elected and qualified, regardless of the orders and judgments of the court? Are the judicial and legislative departments of the territorial government to be thus encouraged to wage war upon each other's dignity, and bring odium and discredit upon both? Case law, so called, may be found in support of almost any proposition that the vagaries of counsel may advance or invent. But I doubt if the history of legal proceedings furnishes any precedent at all similar to the one under consideration. Some of the facts found in, and many of the legal principles applied to, an authoritative case in Illinois (Dickey et al. v. Reed, 78 Ill. 261), ought, in my opinion, to have a controlling influence in the decision in this case. All of the wrongful acts charged to the county commissioners in the bill are properly reviewable in a statutory contest before the council or the house of the general assembly. The law presumes that the decision rendered therein will be just, and hence has made it conclusive. "When the law furnishes," says the supreme court of Illinois in the case cited, "a mode for contesting any election, that mode must be followed." Again: "Courts of equity have no inherent power to try contested elections, and they have never exercised such power except in cases where it has been conferred by express enactment or necessary implication." And: "Injunctions, when issued by a court not having power, need not be obeyed." It is useless to urge that this suit was not instituted to contest an election. The bare perusal of the bill shows that such was its main object, and that the complainants were unwilling to take the requisite statutory steps, and submit their claims to the arbitrament of the only tribunal authorized by law to hear, try, and determine the same. It follows, in my judgment, that

the proceedings were coram non judice and void, and that the relators may not be punished for contempt in disobeying the injunctional order.

The commitment of the relators appears to me to be illegal also, because the court had no power to inflict as punishment for disobedience of the writ a fine in excess of that prescribed by the statute. Section 665 of the Compiled Laws of New Mexico of 1884 reads as follows: "No judge of the district court shall fine any person for contempt for a want of respect for the court in a sum exceeding fifty dollars, without a trial by jury." There is no pretense of a jury trial in this case, and still each of the relators was fined $200 for the violation of this injunction, and ordered to prison until the payment thereof. The trial judge, recognizing the binding force of the statute, discovered that there were four distinct mandates in the writ, and multiplying the $50 by four—the number of the acts covered by the restraining aegis of the injunction—he pronounced the multiplied sentence as the judgment of the law. Plainly this was error. The writ must be regarded as a single, indivisible, judicial act, and punishment for its violation ought not to exceed the maximum amount fixed by the statute. Had the judgment ended in the fine alone, perhaps it would be void for the excess only; but, when it consigned the alleged transgressors to the county jail until such fine was fully paid, it deprived the citizen of his liberty, because, perhaps, unable to pay an illegal exaction, and thereby became oppressive and void in toto. The relators might have been able and willing to pay the statutory amount, but unable, though ever so willing, to pay the excessive ransom.

The foregoing remarks embody my views as to the merits of this painful controversy. It follows, in my judgment, as the injunction proceedings were void ab initio, and as the judgment pronounced upon relators

in the attachment proceedings to punish them for con-
tempt in violating the commands of· the writ was.
equally void, because rendered in violation of the plain
provision of the statute, that the relators are unlaw-
fully restrained of their liberty, and should be uncon--
ditionally discharged from imprisonment.